Stephen Metz, Esq. VSB # 89738
Offit Kurman, P.A.
7501 Wisconsin Avenue, Suite 1000W
Bethesda, MD 20814
(240) 507-1723
smetz@offitkurman.com
*Counsel for Plaintiff Paul Gleit*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | |
| **TAYLOR MADISON FRANCOIS BODINE** | : | Case No.  21-11238-KHK |
| | : | Chapter 7 |
| Debtor | : | |
| | : | |
| **PAUL GLEIT,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. No. 21-01057-KHK |
| | : | |
| **TAYLOR MADISON FRANCOIS BODINE** | : | |
| | : | |
| Defendant/Debtor. | : | |
| | : | |

### AMENDED COMPLAINT TO DETERMINE
### DISCHARGEABILITY OF DEBT OWED TO PAUL GLEIT

Paul Gleit (the "Plaintiff" or "Gleit"), a creditor herein, by his undersigned counsel, and

for his Amended Complaint against the Defendant Taylor Madison Francois Bodine ("Debtor" or

"Bodine") alleges as follows:

### PARTIES

1.      Plaintiff is an individual resident of Florida.

2.      The Debtor is an individual resident of Virginia.

**<u>FACTS</u>**

3.      Gleit is a businessman and investor.

4.      In or about mid-May 2017, Gleit became acquainted with Debtor and her business, Francois-Bodine Consulting, which provides social referral, that is, matchmaking, services.

5.      Debtor markets Francois-Bodine Consulting as the leading luxury matchmaking and elite relationship consulting firm in the Greater Washington D.C. metropolitan area and claims to do business not only in that area, but nationwide.

6.      In May 2017, Gleit and Debtor had a series of conversations concerning Francois-Bodine Consulting and the matchmaking services that could be provided to Gleit. These communications included telephone conversations between Gleit and Debtor and email communications between Gleit and Debtor. In addition, Gleit reviewed Taylor's Francois-Bodine Consulting website ([www.francois-bodine.com](www.francois-bodine.com)) and other information concerning Debtor and Francois-Bodine Consulting.

7.      During these conversations, Debtor told Gleit that she routinely provided matchmaking services to clients in New York, and that she travelled to New York City approximately twice a month to work from an office that she maintained in New York City for that purpose.

8.      On or about May 25, 2017, Debtor emailed a proposed agreement, entitled "Francois-Bodine Consulting Personal Introductions Agreement" (the "Agreement"), to Gleit. The Agreement recites that Francois-Bodine Consulting is "a nationally based firm" that "is in the business of providing introductions to individuals to enable them to meet others for the purpose of entering into long-term romantic relationships/marriage."

9.      On or about May 25, 2017, Gleit electronically signed the proposed Agreement and returned it to Debtor.

10.     Pursuant to the Agreement, Gleit retained Francois-Bodine Consulting to provide him with matchmaking and social referral services (for a minimum period of two years) in consideration for a payment by Gleit of a "Consulting/Matchmaking Fee" in the amount of $35,000 (the "Fee") and a processing fee of $490.

11.     The Agreement provided that the $35,000 Fee "encompasses the complete matchmaking fee for an unlimited amount of introductions."

12.     The parties agreed that the $35,000 Fee could be paid in installments over time.

13.     Between May 20, 2017 and October 18, 2017, Gleit made ten payments to Debtor by Visa card or wire transfer in the aggregate amount of $39,790.

14.     Debtor also told Gleit that all services provided to him were within the scope of the services referred to in the parties' Agreement and therefore were not subject to additional fees or charges.

15.     Gleit was never asked to pay, nor did he ever agree to pay, additional fees, in excess of the $35,000 Fee, for additional services beyond those contemplated by the parties' Agreement.

16.     Gleit never requested or received additional services (other than those referred to in the parties' Agreement) from Debtor or Francois-Bodine Consulting.

17.     At the beginning of November 2017 and throughout that month, and throughout the month of November 2017, Debtor and Debtor's representative, Megan, and Debtor's attorney, Mr. Jackson, began to demand that Gleit make additional payments to Debtor, despite

Gleit's prior payment in excess of the $35,000 Fee (the last installment of which was made on October 18, 2017).

18.     In November 2017, Debtor, and Debtor's representatives Megan and Mr. Jackson applied high-pressure sales tactics through constant communications to Gleit through various methods, in which they knowingly misrepresented the nature and amount of the demanded additional payments.  Many of those representations were via text message, and the details of those text messages is described in more detail below.

19.     In November 2017, Debtor, and Debtor's representatives Megan and Mr. Jackson falsely stated to Gleit that he owed them additional fees under the parties' Agreement for, credit card reversal charges, bank fees, and generally that Gleit simply owed more money without providing significant detail concerning why Gleit owed more money.  When making those representations, Debtor knew they were false.

20.     In November 2017, Gleit made the following payments to Debtor, via wire transfer:

| Payment Date | Payment Amount |
|---|---|
| 11/3/17 | $7,300 |
| 11/10/17 | $32,981 |
| 11/10/17 | $4,509 |
| 11/13/17 | $49,168 |
| 11/14/17 | $49,456 |
| 11/14/17 | $17,000 |
| 11/14/17 | $10,000 |
| 11/16/17 | $49,000 |
| 11/16/17 | $17,000 |
| 11/17/17 | $22,500 |
| 11/20/17 | $48,000 |
| 11/21/17 | $52,000 |
| 11/28/17 | $28,500 |
| TOTAL | $387,414 |

21.    To induce Gleit to make the above payments to Debtor, Debtor and her representatives Megan and Mr. Jackson exchanged multiple text messages with Gleit in November 2017, and also spoke to Gleit via telephone.  The texts included the following from Megan:

> Hi Paul it looks like your final bill owes an additional 4509 where the card was rejected making for total of 37490
> She said in the email she told you that she would call the bank to make sure that there were no more charges so you wouldn't be charged anything else she's just asking that you pay the difference so that we can settle this once and for all
> I know it wasn't on purpose but the credit card company says it was rejected
> Difference is 4509

22.    Gleit responded "I see ok."

23.    On behalf of the Debtor, Megan further stated to Gleit:

> Can you do that. And I will personally send the receipt that says as the co-owner of the company I am sure you that you owe nothing more ever again

24.    Gleit responded "OK, will send it out.  That would be great."

25.    On behalf of the Debtor, Megan further stated:

> Ok let me know when it's complete I will then send the email and CC everyone in the company as well as send it directly to you

26.    Gleit responded in an attempt to confirm that he would not owe any additional money to the Debtor: "I had them send the wire transfer.  After this I'm not going [sic] owe anymore.  I'll be squared away?"

27.    On behalf of the Debtor, Megan confirmed Gleit would not owe any more, but as explained below, this confirmation did not last long because the Debtor demanded additional money from Gleit, through her representative Megan and her attorney Mr. Jackson.  On behalf of the Debtor, Megan's initial confirmation message was as follows:

You are 100 square after we receive this because it covers all cc transactions lawyer agrees and can send you a note saying this

28.     On November 10, 2017, Debtor stated in an email to Gleit and a Francois-Bodine Consulting representative that other than $4,509 that he purportedly owed, Gleit "does not owe any more money for the duration of his time with us unless he elects for additional services."

29.     On or about November 13, 2017, on behalf of the Debtor, Megan sent the following text to Gleit:

Paul can you view email it's Megan by the way taylor is out for the evening
Need your response :-)
We want to send you docusign document that says this amount and this is the conclusion of monetary contention and you have a 2 year term with us with 30 min free coaching each week
I see.   Will send it out

==tomorrow.   Don't think that amount was reflected in the email==

30.     On or about November 13, 2017, Debtor and Francois-Bodine Consulting provided Gleit with a proposed agreement for his signature which provided that, upon Gleit's additional payment to Taylor and Francois-Bodine Consulting of an additional $81,819, Gleit would owe Debtor and Francois-Bodine Consulting no further payments for the balance of the term of the parties' Agreement.

31.     Debtor and Megan falsely stated to Gleit that he owed them additional fees of $81,819 for credit card reversal charges, bank fees and simply that Gleit owed more money (although it was not clear for what).  When making those representations, Debtor knew they were false.

32.     In reliance on the misrepresentations made to him, on or about November 13, 2017, Gleit executed this proposed agreement (the "November Agreement") and returned it to Debtor and Francois-Bodine Consulting.

33.     In conjunction with Debtor's request that Gleit sign the November Agreement, on behalf of the Debtor, Megan texted Gleit:

Good morning Paul. We have the docusign document sent with full instructions and disclosure that this need the financial obligation please sign and send wire this morning.

34. On behalf of the Debtor, Megan also wrote:

He says he would need you to pay 49456 to The wire information you usually send it to. And he would need you to pay 17 to the new wire info he sent. We would then go ahead and just wave completely the other 20,000

35. The "he" referenced in the above text appears to be a reference to Debtor's attorney, Mr. Jackson.   The $49,456 is close to the amounts referenced in the November Agreement, which references receipt of a payment in the amount of $49,168, and an additional payment due in the amount of $48,918.

36. The November Agreement made no reference to an additional $17,000 payment notwithstanding the demand made upon Gleit to make that payment, which Gleit in fact did make on November 16, 2017.

37.    Following the above text communications, on behalf of the Debtor, Megan texted

Gleit:

> Please let me know he's asking I
> get back to him in the next five
> minutes because Taylor asked
> him to Wade the 20,000 if you
> were able to do it this way
> Waive
> 49,456 please use the original
> wire information
> 17,000  to new wire information
> address both to taylor francois

38.    After Gleit signed the November Agreement, on behalf of the Debtor, Megan

persisted:

> Received docusign please send
> text when wire complete thank
> you

39.    After Gleit sent additional funds, on behalf of the Debtor, Megan requested

another $10,000:

> Thank you the bank charging us 10k fee from your account
> Can you please rectify immediately counsel is asking
> I'd like to close this out today for all of us :-)

40.    In justifiable reliance on the (false) representation that Gleit owed another $10,000, Gleit responded: "I'll wire another 10K then."

41.    Gleit did in fact wire Debtor another $10,000 on November 14, 2017.  Instead of acknowledging receipt of the additional $10,000, which was in fact wired to Debtor's account, on behalf of the Debtor, Megan falsely represented to Gleit:

> Hi Paul it sent 10 through but bank rejected and sent back to your bank it said transfer error. Hopefully tomorrow before 10 we can speak and solve this so we can move on :-)

42.    In justifiable reliance on the (false) representation that the $10,000 transfer did not go through, Gleit responded: "OK, I had them transfer 17K over to you!"  Gleit did in fact transfer another $17,000 to Debtor on November 14, 2017.

43.    On behalf of the Debtor, Megan responded:

> **You have paid EVERYTHING will let you know when it clears**

44.    Again, although Megan had confirmed (on behalf of the Debtor) Gleit paid Debtor in full, Debtor's counsel, Mr. Jackson, continued to demand more money from Gleit.

45.    After receiving a demand from Debtor by counsel Mr. Jackson, Gleit texted Megan: "Your counsel called me. What's that about?  Just spoke to the Counsel that I owe another 22k.  Do you know what that's about?"

46.    Megan falsely stated that she did not do accounting (even though she had previously demanded money from Gleit and even though the Debtor had referred to Megan as "the partner in charge of accounting"), and responded:

> **Please see him directly. I'm not sure I don't do accounting.**

47.    In November of 2017, Debtor's attorney Mr. Jackson was also communicating with Gleit and was also demanding more money from Gleit.

48.    Mr. Jackson wrote:

Mr Gleit thank you for this and we appreciate your patience in this as well. I tried to get this removed but was unable to do so. This is my fault I assume once the paperwork of receipt showed this would be good enough but they show that total before fees has been paid but that $15k in fees is due. I am so sorry for this mix up. They allowed me to temporarily remove this until tomorrow. Megan has put down $15k to get it removed. Can this be rectified tomorrow but for your peace of mind it has been removed today.

No problem Paul. Did you see the above text?

49.    Gleit responded: "Yes I did."  Theses texts occurred around Thanksgiving 2017.

50.    On behalf of the Debtor, Mr. Jackson continued with demands for more money:

Thank you!  And have a nice thanksgiving! Sorry it needs a response can you view it again. I sent it at 7:04

51.    Gleit responded: "I hope you have a nice thanksgiving too! I need to send another 15K Tomorrow? Correct?"

52.    On behalf of Debtor, Mr. Jackson then responded to Gleit and appeared to threaten Gleit with a lawsuit or judgment in the event Gleit failed to pay additional sums:

Yes for the fees but we have has judgment vacated he is simply waiting on that receipt. Please send when you can tomorrow morning. I trust you will do this. Happy Thanksgiving and thank you for your help !

53.    Gleit responded: "Yes, will do.  I understand. Misread it before. Thank you."

54.    On behalf of Debtor, Mr. Jackson replied:

No problem Mr. Gleit I am reviewing this tonight and will call in morning to ensure we have the final amount correct.

55.    Gleit responded: "Will send the 15K tomorrow in the morning!"

56.    On behalf of Debtor, Mr. Jackson again replied:

Mr Gleit please call before sending. We conducted review of this and there is a little error.

57.    After a few additional short texts, on behalf of Debtor, Mr. Jackson replied:

Thank you I'm thrilled to get this case off my plate !
As long as it is before 4pm we will be good

58.    Gleit responded: "Ok, and then that'll be it? I sent it out.  This is the last one I'm sending out.  I've sent too much $ out already."

59.     However, Debtor was not done with Gleit.  On behalf of Debtor, Mr. Jackson later texted Gleit:

I lost you on this call. Quick version is pribcipal has been paid in full. The interest for late charges has not and I am not able to get conclusory paperwork until then. I was trying to handle this today before a senior person comes in. The interest is 28.5kfor last 7 months I'm hoping we can resolve this so we can get conclusory paperwork for Interest.

60.     There was no basis to demand more money.  There was no loan with principal and interest due.  Notwithstanding those facts, on behalf of Debtor, Mr. Jackson was demanding interest of $28,500.

61.     Gleit justifiably relied on these false representations and did in fact wire $28,500 to Debtor on November 28, 2017.

62.     On behalf of Debtor, Mr. Jackson also represented to Gleit:

Paul I tried to call you. Okay I spoke with your matchmaker and she says that you want to get a refund of what you have paid and litigate this. Is this correct? I must know before 3pm Your matchmaker absorbed $17k of the fees

63.     Gleit responded: "I'm not asking for a refund and no I do not want to litigate this! So this means I owe 11.5K? Is that correct?"

64.     On behalf of Debtor, Mr. Jackson replied:

15

Incorrect sir. You owe $28.5 after she absorbed
$17
Litigate may be best for you

65.    Gleit justifiably relied on the representation that he owed another $28,500,

knowing that he wanted to avoid litigation and be done with having to pay money to Debtor, and

stated: "Oh, I see.  If I sent 28.5K that'll be it?"  As Gleit had stated that he wanted to be done

sending money to the Debtor, he stated: "I don't want to be sending any more than that."

66.    On behalf of the Debtor, Mr. Jackson pressed Gleit:

Yes but would need to be done before 3 so I
may get conclusory document on fees
I understand and you will owe no more either
It is time sensitive and she is not available
tomorrow please advise.
She helped reduce this

67.    Gleit responded: "I understand but I am away on business till tomorrow and have

very limited access to internet and WiFi."

68.    On behalf of the Debtor, Mr. Jackson responded:

Sir we have to go ahead with the refund and
filing. I mentioned we needed this cleared this
morning.

69.    Gleit replied: "I just got bank [sic] from my business truly [sic] Trip  Will send

out the wire today and you will receive by 3:00  Sorry."

70.    On behalf of Debtor, Mr. Jackson replied:

We will receive this wire by 3:00?
Was it sent in its entirety?

71.    Gleit responded that he had sent the wire and that he had informed the Debtor and

Megan.

72.    On behalf of Debtor, Mr. Jackson responded:

Ok
Megan will send full receipt and
full refund via check you should
receive in few days.
We file tomorrow. Thank you for
your time

73.    Confused by the response, Gleit replied: "What's the issue? I sent the 28.5 like

you asked. What refund?"

74.    On behalf of Debtor, Mr. Jackson responded:

We would like to refund your fee
and part ways
Megan has reviewed and sees
her error. They have decided to
work with you and ok no longer
involved. Please contact taylor

75.    The Debtor did not refund any of Gleit's money to Gleit.

76.    In addition to the texts described above, on behalf of Debtor, Megan sent an email

to Gleit (and cc'd the Debtor) on November 11, 2017 in which she stated, among other things,

that the Debtor's credit card company "took another of the summer payments paul made out of

our account.  This time the amount is for 5 credit card transactions that posted to our account by

then as of today have been withdrawn after security review for $18910, $19190, $9870, and

$16459, $12,987."  Those amounts total $77,416.  It appears that the Debtor, through her

representatives, Megan and Mr. Jackson, misrepresented to Gleit that he owed the Debtor some

or all of those amounts, when in fact Gleit had paid all that he actually owed and when in fact

there was never any basis to assert that Gleit owed anything more than the amount agreed to in

the initial May 2017 Agreement.

77.      Notwithstanding the November Agreement, and despite Gleit's payment of the

$81,819 referred to above, Debtor and Francois-Bodine continued to pressure Gleit to deliver

additional payments to Debtor, knowing that Gleit did not actually owe any additional money.

78.      In justifiable reliance on the misrepresentations made to him, and as a result of the

high pressure sales techniques employed upon him by Debtor and on her behalf by Megan and

Mr. Jackson, in November of 2017, Gleit made an additional 13 payments to Debtor in the

aggregate amount of $387,414 (hereinafter "Additional Payments"),  $293,456 of which were

paid after Gleit signed the November Agreement.

79.      Between May 25, 2017 and November 1, 2017, Debtor and Francois-Bodine

Consulting provided Gleit with a total of approximately eight (8) social introductions which

resulted in six (6) social dates (which took place in New York City, Washington D.C. and

Florida).

80.      In late November 2017 (after the November Agreement), Debtor and other

Francois-Bodine Consulting representatives demanded that Gleit pay an additional $50,000 in

fees.

81.     Only when Gleit's counsel communicated with Debtor by email on December 1, 2017 did she withdraw the demand, claiming that the demand had been "an error" and that he was "paid in full for his two year remainder."  By this time, Debtor had already defrauded Gleit out of the Additional Payments.

82.     Upon realizing that Debtor and Francois-Bodine Consulting had lied to him about bank fees, credit card charges and other amounts described in this Complaint and had demanded and received fees well in excess of the fees contemplated by the parties' Agreement (as described above), Gleit demanded a refund of the Additional Payments, which demand was rejected by Debtor and her representatives.

83.     Debtor's conduct was egregious and tortious, and upon information and belief part of a pattern of similar conduct directed at the public generally.

84.     On January 12, 2018, Gleit filed a complaint against the Debtor in the United States District Court for the Southern District of New York (the "SDNY Complaint") seeking damages against the Debtor based upon the facts set forth herein.  The SDNY Complaint included a count for common law fraud.

85.     In the case pending in the Southern District of New York, Gleit propounded Requests for Admission, and the Debtor responded.  A true and correct copy of Debtor's Responses to Plaintiff's Requests for Admission (the "RFA Responses") is attached hereto and incorporated herein as Exhibit 1.  The RFA Responses contain a detailed itemization of all of the transfers Gleit made to the Debtor, totaling $426,104.00.

86.     On July 16, 2018, Gleit and the Debtor entered into a Settlement Agreement and Release resolving the claims set forth in the SDNY Complaint (the "Settlement Agreement").

87.     In Section 2.1 of the Settlement Agreement, Debtor agreed to pay Gleit $250,000. The Settlement Agreement further provides: "Francois-Bodine hereby represents and agrees that the Settlement Amount constitutes a debt which is non-dischargeable in bankruptcy pursuant to 11 U.S.C. § 523, and that she will not seek or accept discharge of that debt for any reason under any section of the United States Bankruptcy Code or any other federal, state or local law."

88.     The Settlement Agreement contained provisions that allowed Gleit to obtain a judgment in the event Debtor defaulted by failing to pay Gleit.

89.     On August 13, 2018, the parties filed a Stipulation of Voluntary Dismissal, thereby dismissing the SDNY Complaint.

90.     Subsequently, Debtor defaulted on her payment obligations.

91.     On or about April 30, 2021, Gleit filed a Motion for Summary Judgment in Lieu of Complaint against Debtor in the Supreme Court of the State of New York, County of New York (the "NY Supreme Court") for purposes of entering judgment against Debtor on account of her default under the Settlement Agreement (the "NY State Action").

92.     On July 1, 2021, the NY Supreme Court entered judgment in favor of Gleit and against Debtor in the total amount of $384,400.72 (the "NY State Judgment").

93.     As a direct and proximate result of the Debtor's fraudulent, willful and malicious conduct, Gleit had incurred damages in the amount of the NY State Judgment.

### Count I:
### Denial of Dischargeability Pursuant to 11 U.S.C. § 523(a)(2)(A) (Fraud)

94.     Gleit incorporates, repeats, and realleges all allegations set forth in the paragraphs above.

95.     The representations described herein (the "Representations") made by Debtor were false when made.

96.     Debtor knew that the Representations were false.

97.     Debtor made the Representations with the present intent to deceive Gleit and to induce Gleit to advance the Additional Payments.

98.     Gleit reasonably and justifiably relied upon the Representations.  At the time when Debtor, Megan and Mr. Jackson were texting, calling and demanding payments from Gleit (and until Gleit realized the true extent of payments made to Debtor), Gleit trusted Debtor, believed that if Debtor was requesting money from him that he did owe additional money, did not want to be involved in litigation over the charges, and was a busy businessman involved in multiple transactions and money transfers.  As such, he justifiably relied on the Representations to his detriment and transferred the additional funds to the Debtor.

99.     In reasonable and justifiable reliance on the Representations, Gleit advanced to Debtor the Additional Payments.

100.    The Representations were material.  But for the representations, Gleit would not have advanced the Additional Payments to Debtor.

101.    The Representations were fraudulent.

102.    The fraud committed by Debtor proximately caused Gleit to incur damages, which the NY State Court has determined to total $384,400.72.

103.    The fraud committed by Debtor was willful and malicious and committed with the intent to harm Gleit.

WHEREFORE, Gleit requests that this Court award the following relief:  (i) that the Court determine that Debtor is not entitled to a discharge of the NY State Judgment; (ii) that the

Court award to Gleit his attorney's fees and costs in prosecuting this action; and (iii) that the Court award to Gleit such other and further relief as the Court deems proper.

**Count II:**
**Denial of Dischargeability Pursuant to 11 U.S.C. § 523(a)(6)**
**(Willful and Malicious Injury)**

104.    Plaintiff incorporates, repeats, and realleges all allegations set forth in the paragraphs above.

105.    As explained above, Debtor intentionally and deliberately made the Representations described herein, which Debtor knew to be false, to obtain the Additional Payments from Gleit.

106.    Debtor acted with a knowing disregard of the rights of Gleit.

107.    Debtor acted with malice toward Gleit when making the false and fraudulent Representations.

108.    Debtor defrauded Gleit and took the Additional Payments from Gleit.

109.    The actions of Debtor caused willful and malicious injury to Gleit and to his property and caused Gleit to incur damages.

WHEREFORE, Gleit requests that this Court award the following relief:  (i) that the Court determine that Debtor is not entitled to a discharge of the NY State Judgment; (ii) that the Court award to Gleit his attorney's fees and costs in prosecuting this action; and (iii) that the Court award to Gleit such other and further relief as the Court deems proper.

Respectfully submitted,

**OFFIT KURMAN, P.A.**

 */s/ Stephen Metz*
Stephen Metz, Esq., VB No. 89738
7501 Wisconsin Avenue, Suite 1000W
Bethesda, MD 20814
(240) 507-1723
smetz@offitkurman.com
*Counsel for Plaintiff*

4884-7604-4551, v. 1